Matter of K.E. v A.E. (2025 NY Slip Op 51557(U))

[*1]

Matter of K.E. v A.E.

2025 NY Slip Op 51557(U) [87 Misc 3d 1213(A)]

Decided on September 25, 2025

Family Court, Kings County

Menon, J.

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on September 25, 2025
Family Court, Kings County

In the Matter
of Article 6 
 Custody/Visitation Proceeding K.E., Petitioner/Respondent,

against
A.E., Petitioner/Respondent

File No. 314098

Joshua Reuven Katz, Esq., 9027 Sutphin Blvd. Ste. 402, Jamaica, NY 11435 for
Petitioner/Respondent K.E.
Gregory Gorodetsky, Esq., 1723 E. 12th St.,
Brooklyn, NY 11229, Counsel for Petitioner/Respondent A.E.

Nisha Menon, J.

Procedural History
On March 31, 2023, K.E. filed a petition for custody of his son, L.E. On that same
day, A.E. filed a family offense petition against Mr. E., alleging that he had committed
several crimes against her. On or about May 24, 2023, Ms. E. filed a cross-custody
petition regarding L. On March 15, 2024, the family offense matter resolved on consent
with a one-year Order of Protection which forbid Mr. E. from communicating with Ms.
E. except through the Our Family Wizard platform with regard to parenting time and the
wellbeing of the child. The trial of these cross-custody petitions also commenced on
March 15, 2024, with further testimony being heard [*2]on August 19, 2024, August 21, 2024, September 23, 2024,
December 20, 2024, February 14, 2025, February 19, 2025, April 28, 2025, and July 3,
2025. Written summations were due to the Court by August 22, 2025.
Findings of Fact
Mr. E. met Ms. E. on March 28, 2017. Soon after, they
developed a relationship. They began living together in September 2017 and were
married in August 2019. The couple initially lived together in New Jersey but moved to
Brooklyn in October 2020. Their son L. was born on in 2022. Mr. E. was actively
involved in prenatal appointments and was present when L. was born. After L. was born,
both parents continued to care for him, though Ms. E. was home on parental leave and
did the bulk of childcare. 
In early 2022, due to the ongoing war, the couple decided to have Ms. E.'s mother
and brother move from Ukraine to live with them in Brooklyn in a two-bedroom
apartment. While Ms. E.'s brother moved out after a few months, Ms. E.'s mother
continued to reside with the couple and L. After Ms. E.'s mother moved in, she took over
some childcare duties including attending well visits with Ms. E. and L.
Ms. E. testified that she went back to work when L. was about 5 months old to
support the family financially, including to maintain the family's health insurance. Ms.
E.'s mother cared for L. when Ms. E. was working. Ms. E. testified as to the small details
of her care of L. including trimming his nails, dancing, playing with Play-Doh, etc. These
details support the Court finding Ms. E.'s testimony credible that when she returned from
work, she provided the bulk of the childcare. However, the Court does credit Mr. E.'s
testimony that he also was involved in caring for L. when he was not working.
Mr. E. repeatedly raised issues that he appeared to believe reflected negatively on
Ms. E.'s inherent character and suitability as a parent. He testified that the parties met at a
go-go bar that he frequented [FN1]
near his home shortly after Ms. E. began working there. At the time of their marriage,
Mr. E. believed Ms. E. had overstayed on a student visa, though Ms. E. submitted
documentation indicating that she did have a valid visa at the time they were married and
testified that she obtained a green card during the marriage. Mr. E. was critical of Ms.
E.'s decision to take the subway with L. the day after a shooting on a subway. While the
Court does understand why this caused Mr. E. concern, there is no basis to believe that
Ms. E.'s decision to take the subway that day was reckless or inappropriate. Finally, Mr.
E. believed that Ms. E. had accidentally locked L. alone in the apartment while having a
drink with a neighbor. Ms. E. strongly disputed Mr. E.'s accusations. She testified that
she had opened to door to give a package to her neighbor and, when the door shut and
locked behind her, she immediately had another neighbor enter her apartment through the
shared fire escape to then open her door, which only took a few minutes. Ms. E. is the
only person who testified who had direct knowledge of this incident and she appeared
candid and forthcoming while doing so. Having had the unique opportunity to observe
the demeanor and testimony and assess credibility, the Court credits her [*3]testimony.
In contrast, the Court finds Mr. E.'s testimony significant for demonstrating how
negatively he views Ms. E. and his desire to overstate safety and parental fitness
concerns about her. Notably, his criticisms of Ms. E. were at times plainly hypocritical,
including condemning her for working at a bar that he admitted that he regularly
patronized himself, and for attacking her for living in a "dilapidated, terrible
place"[FN2]
when he had lived in effectively the "same building, same environment, same
everything"[FN3]
that was only "50 feet away"[FN4]
prior to the couple breaking up. Mr. E. also seemed to suggest that Ms. E. was effectively
engaging in a fraudulent relationship with him motivated by her seeking immigration
status. However, the Court does not find this convincing as Mr. E. was aware of Ms. E.'s
immigration status, the couple were together for years, chose to get married, chose to
have a child together, and Ms. E. provided compelling evidence that her eventual
decision to leave was due to the hostile environment Mr. E. played a significant role in
creating. 
In March of 2023, Mr. E. left New York for a five-day business trip. Mr. E. believed
that Ms. E. had initially planned to join him on the trip, but shortly before their planned
departure she said she had to stay behind to cover a work emergency. On the day he
returned and after his plane had landed, Ms. E. texted him that she had taken L. and
moved out of the apartment but had fed and walked the dog before she left. Mr. E.
responded with a series of vitriolic texts, including "I pray that you die a slow horribly
painful death. Like brain cancer you fucking cunt."[FN5]
Mr. E. indicated that he was frantic and desperate to find L. He immediately called the
police who arrived at the home before he did. He was then delayed in entering the
apartment because he lost his keys but when he did, he believed the dog was "hungry
[and] frail."[FN6]

Mr. E. eventually reviewed camera footage from the apartment building and became
convinced that Ms. E. was assisted in moving out by the son of her attorney, Mr.
Gorodetsky. Ms. E. testified that the person who assisted was someone she had hired and
had no connection to her attorney. Nonetheless, Mr. E. repeated the narrative he'd created
and returned to the issue several times during his testimony, albeit at time raised by
counsel for Ms. E. The Court credits Ms. E.'s testimony as, like with the incident of the
apartment door locking with L. inside, Ms. E. is the only person with firsthand
knowledge who testified and she presented as credible during her testimony. However,
the Court attaches no importance as to who assisted Ms. E. in moving, other than to note
Mr. E.'s outrage and fixation on his theory.
Ms. E. testified that she knew Mr. E. would be angry when she and L. left and that
she deliberately left before he returned because he was often angry and verbally abusive
to her. She explained that she filed for an Order of Protection against him because she
"was experiencing [*4]constant pressure, threats,
disrespect, humiliation."[FN7]
She conceded that he had never physically harmed her, but testified that he frequently
disparaged her, such as calling her a "whore" in front of L.[FN8]
and threatened to inflict physical harm on her.[FN9]
The text messages that he sent to her when he learned she had left, such as specifying
that he hopes she dies a slow and painful death like from brain cancer, only bolster her
testimony as to the way he would treat her before she left. Ms. E.'s mother, T.U., also
testified to observing the couple argue frequently, and that during arguments, Mr. E.
would use abusive language towards Ms. E., such calling her "a prostitute, a bitch, a
whore [and that] she was stupid,"[FN10]
including saying these things when L. was present.[FN11]

Even text messages that were offered by counsel for Mr. E. and admitted into
evidence support Ms. E.'s testimony about his deep, intense anger and derision of her,
including statements that "this is an apology for what I will be doing. I will spend every
day of my life working to not only win my son back, but also [Ms. E.] will reap the
consequences in court, and she will lose everything" [FN12]
and "I swear on L.'s life, that until either I or her die, that I will do all there is to be done
to show the world her true devil self."[FN13]
The court also notes that Mr. E. is significantly larger than Ms. E. Given his intense
anger, his continuous disparagement of her, the size difference between the two, and his
attempts to hold immigration issues over her head [FN14]
, the Court finds it both reasonable and credible that Ms. E. felt intimated by and afraid
of Mr. E. 
In the weeks that followed Ms. E.'s move with L., Mr. E. was urgently seeking
contact with L. and he continued to reach out to Ms. E. multiple times a day until he was
served with an order of protection. He received a temporary order of visitation about 15
days after Ms. E. left with L. Mr. E. testified that Ms. E. cancels his parenting time
inappropriately and that he spends $60-70 in tolls plus gas to exercise his parenting time
now that Mr. E. moved to New Jersey.
Mr. E. also expressed concern that Ms. E. was not meeting L.'s educational needs.
He testified that he had brought up concerns regarding L.'s speech for months before Ms.
E. agreed [*5]to obtain services, and that once she did,
she obtained services from a Russian speaking provider. Mr. E. objected to L. obtaining
services from a Russian speaking provider as Mr. E. does not speak Russian and wants to
be able to communicate with L. Ms. E. conceded that at the time Mr. E. first raised issues
about L.'s delays, she did not believe L. was significantly delayed and did not take steps
to get an evaluation. However, as L. grew older, she saw reasons to be concerned and did
arrange an evaluation and services. She believes, based on emails she received from a
service provider that allegedly included forwarded communication between Mr. E. and
the provider, that Mr. E. thwarted her efforts to obtain services by threatening providers
who speak Russian. For this reason, she has consented to L. receiving some of his
services in New Jersey. It is clear from both parties' testimony that they cannot make
decisions together. Ms. E. presented evidence of providing Mr. E. with medical
information and documents [FN15]
, yet he still complained and criticized the medical treatment. The evidence and testimony
demonstrated that any attempt to discuss the substance of an educational or medical
decision with Mr. E. would devolve from a discussion of the issue at hand into a diatribe
by Mr. E. about how horrible of a person and mother Ms. E. is.
Legal Analysis
In summations submitted by counsel, each parent
respectively contends that they should be awarded sole legal custody. Ms. E. contends
that she should also be awarded primary physical custody, while Mr. E. contends that the
parties should be both awarded joint physical custody with a 50/50 split of parenting time
on a 5-5-2-2 type schedule. On summation, for the first time, Mr. E. also reports that
"regardless of how this Court determines legal custody, [he] shall return to reside in
Brooklyn, within a short distance of [Ms. E.'s] residence."[FN16]
However, it is notable that there was no testimony at trial whatsoever by Mr. E. about his
intent to relocate to Brooklyn. Instead, he testified at length about what he believed
where the advantages of his residence in New Jersey, which makes the Court unable to
consider his newly stated intend to relocate to Brooklyn a reliable plan.
The decision to grant initial custody of a child must be based upon the best interests
of the child standard. See, Friederwitzer v Friederwitzer, 55 NY2D 89 (1982);
Eschbach v. Eschbach, 56 NY2d 167 (1982). Ms. E.'s history as the primary
caretaker for L., her more stable demeanor, and her credible assertion that she will
comply with orders for her son to have parenting time with her father, all weigh in favor
of an award of custody to Ms. E. being in L.'s best interest. 
Mr. E. testified that he believes that he is the parent better able to provide for L., that
he has a nicer home environment (in New Jersey), and that he would be more supportive
of a healthy coparenting relationship. 
The Court does not credit Mr. E.'s contention that he is the parent better able to
financially support the child. Mr. E. admitted he needed to file for bankruptcy in part due
to legal fees. Ms. E. testified that she went back to work because the family was
struggling [*6]financially and they needed health
insurance. The Court does not find that financial stability weighs in either parent's favor.
Rather, they both appear to be similarly able to meet L.'s basic needs.
Mr. E. testified that the couples' move to Brooklyn was always meant to be
temporary. He testified that he felt that L., by primarily residing with his mother in
Brooklyn during the pendency of this matter, was "living in a dilapidated, terrible
place."[FN17]
He went on to testify about the "resort-style living"[FN18]
that he enjoys in New Jersey, and his intent to enroll L. in a private school operated by
his church in East Brunswick. However, Mr. E.'s contentions in this regard were merely
conclusory, and they were further undermined by his statements in summation that he
newly intends to return to reside in Brooklyn. Further, when determining which
environment is more suitable for the child to primarily reside, it is more imperative to
consider which environment is more supportive of the child having a healthy relationship
with the other parent than it is to consider which environment offers "resort-style living."

The determination of how much parenting time and under what parameters is in the
best interests of the child is left to the discretion of the Family Court. See e.g. Larkin v White, 79
AD3d 751, 751 [2d Dept 2010]; McMillian v Rizzo, 31 AD3d 555, 555 [2d Dept
2006].
An award of joint custody here is not appropriate. "Entrusting the custody of young
children to their parents jointly, especially where the shared responsibility and control
includes alternating physical custody, is insupportable when parents are severely
antagonistic and embattled." Braiman v Braiman, 44 NY2d 584, 587 [1978].
"Joint custody is encouraged primarily as a voluntary alternative for relatively stable,
amicable parents behaving in mature civilized fashion." Id. 589-90. These parents
have an acrimonious relationship characterized by Mr. E.'s attempts to control and
undermine Ms. E., as described below. 
The Court further finds it would not be in L.'s best interests to award sole custody to
Mr. E. The Court did not find Mr. E. credible in his claims that he is the parent best able
to support coparenting. Through his testimony, written exhibits (including the text
exchanges he submitted), and his demeanor during the trial, Mr. E. demonstrated that he
has intense contempt for Ms. E. that he is unable to look past in the context of his
coparenting relationship. Indeed, the text messages admitted as Petitioner's Exhibit 7,
messages between Mr. E. and Ms. E.'s mother, demonstrate the depth of his anger. "Your
daughter is not only a liar, ex stripper, a cheat and a con artist, she is unfortunately the
mother of my child."[FN19]
"L. will eventually make her pay when he sees her true self."[FN20]
"I will never teach him to hate her, but he will know every detail of what she did when he
is old enough, and he will decide if she is a 'mother' or . . . . [sic]"[FN21]
"Apparently you think any female is a mother, but a mother is something [Ms. E.] would
[*7]never understand."[FN22]
Respondent's Exhibit L also included text messages from Mr. E. telling Ms. E. "you're
not his mother. A mother is not someone who gives birth. A Mother is something you
can never be."[FN23]
"I AM HIS ONLY PARENT."[FN24]
Although these same text messages from Mr. E. accuse Ms. E. of failing to coparent and
trying to alienate the child, these messages provide clear additional support for the
Court's finding that Mr. E. himself does not support co-parenting with Ms. E. but instead
actively discourages it.
L. is currently three years old and undoubtably will only be more and more aware of
how his parents talk about and treat one another as he grows older. Mr. E. has given this
Court every reason to believe that L. will grow up with an acute awareness of his father's
contempt for his mother. The statement that he won't "teach [L.] to hate [his
mother]"[FN25]
but that he will make sure that his son "will know every detail of what she
did,"[FN26]
is but one example of his inability to shield L. from the intensity of his hatred for L.'s
mother.
Furthermore, Mr. E.'s admissions of open contempt for Ms. E. such as the example
above raises great concern to this Court as it is a hallmark symbol of a parent intending to
use coercive control to alienate a child from the other parent. Pursuant to Domestic
Relations Law §240, this Court must consider the effects of domestic violence upon
the best interest of L. Mr. E.'s attempts to dominate Ms. E. and undermine her as parent
are properly considered as domestic violence. "For over 15 years, scholars have
understood that domestic violence is not limited to acts of overt physical aggression but
rather can exist through the interpersonal relationship dynamics of two adults. One
partner may exert coercion over the other, using 'force or threats to compel or dispel a
particular response.' Evan Stark, Coercive Control: How Men Entrap Women in
Personal Life 228 (2007). Independently, a relationship may feature one partner
controlling the other, through 'structural forms of deprivation, exploitation, and
command that compel obedience indirectly.' Id. at 229. Coercion and control can
exist together, creating a 'condition of unfreedom' also known as entrapment. Id.
at 205." Matter of Aisha R.,
79 Misc 3d 1106, 1109-10 [Fam Ct 2023]. 
Mr. E.'s behavior as described by Ms. E. clearly demonstrate a pattern of coercive
control. She described him as demeaning, easily enraged, and limiting her ability to get
day care and educational services for L. The Court credits this testimony as it comports
both with the text messages and Mr. E.'s demeanor in court. During Ms. E.'s testimony,
Mr. E. rolled his eyes, scoffed, and appeared incredulous throughout, underscoring his
attempts to undermine her. This type of abuse puts Ms. E. at risk even after the
termination of her marriage to Mr. E. "Coercive control can have devastating impacts on
victims/survivors. In addition to its well-documented effects on physical and mental
health, [researchers] highlight that coercive control limits [*8]victims'/survivors' space for action, that is their freedom to
say and do things and to meet their own needs without worry or fear. As perpetrators
microregulate their everyday behaviors, victims'/survivors' options, choices, and ability to
decide for themselves diminish. These constraints on their agency and voice often
contribute to a profound disempowerment, loss of self, and loss of confidence in
victims/survivors." Emma Katz, Beyond the Physical Incident Model: How Children
Living with Domestic Violence are Harmed By and Resist Regimes of Coercive
Control," 25 Child Abuse Rev. 46, 48 (2016) (citations and internal quotation marks
omitted). Ms. E.'s testimony reflects examples of her giving into Mr. E.'s attempts at
control. Specifically, she admitted to signing a lease in New Jersey (Petitioner's Exhibit
4) with the father just weeks before she ended the relationship because he was constantly
pressuring her to do so.[FN27]
She also testified to failing to object to the father arranging services for L. in New Jersey
after he undermined her efforts to obtain services near her home. Were this Court to give
Mr. E. primary custody of L., Ms. E. would be vulnerable to further control as she sought
to preserve her relationship to L.
Mr. E.'s behavior not only has a detrimental impact on Ms. E. who is currently L.'s
primary caregiver, it also directly places L. at risk. "Research has shown that children are
not only witnesses to domestic violence, but actual victims who experience the same
dynamics in the home." Aisha R. at 1113 (citing Katz, supra at 52).
Children exposed to domestic violence have been found to have similar levels of
emotional and behavioral problems, trauma symptoms, and compromised social and
academic development similar to those of children who are direct victims of the abuse.
Samantha Jeffries, In the Best Interests of the Abuser: Coercive Control, Child
Custody Proceedings and the "Expert" Assessments That Guide Judicial
Determinations, 5 LAWS 1, 2-3 (2016). Even though L. may currently be too young
to vividly display the signs of harm from exposure to domestic violence, that does not
mean that the risks are not real, and it is in his best interest to minimize his further
exposure to such violence. 
The impact is not limited to children who witness physical violence. "As one court
quoted an expert, '[the domestic violence] isn't necessarily physical but may be more
dangerous because it's emotional and much harder to detect.'" Lisa Tucker, Domestic
Violence as a Factor in Child Custody Determinations: Considering Coercive
Control, 90 Fordham L. Rev. 2673, 2677 (quoting G.I. v J.S., CK16-03072,
2017 WL 4792366, at *4 [Del Fam Ct May 18, 2017]). The effect can be serious and
long term. "Children who witness domestic violence can suffer serious emotional
symptoms including internalizing symptoms (e.g., anxiety, depression, fear, shame, social
withdrawal, somatic complaints, bedwetting, poor concentration) and externalizing
symptoms (e.g., aggression, impulsivity, bullying, criminal behaviors)." Debra Pogrund
Stark et. al., Properly Accounting for Domestic Violence in Child Custody Cases: An
Evidence-Based Analysis and Reform, 26 Mich J Gender & L 1, 22 [2019].
And the physical separation of the parents does not mean the end of risk of harm, as
"post-separation, perpetrators/fathers can continue to target coercive control at children
as well as at their ex-partners. . . . Like adult victims/survivors, many of the children and
young people were living under conditions of [*9]constraint and entrapment, and coercive control could
severely harm their emotional/psychological, social and physical wellbeing and their
educational achievement." Emma Katz, Anna Nikupeteri & Merja Laitinen,
When Coercive Control Continues to Harm Children: Post-Separation Fathering,
Stalking and Domestic Violence, 29 Child Abuse Rev. 310, 322 (2020) (internal
citation omitted). 
Mr. E. claiming he won't "teach [L.] to hate"[FN28]
his mother is only feigning innocence when he effectively says he intends to do
everything he can to encourage L. to feel the same way about Ms. E. as he does by way
of "every detail"[FN29]
he will tell his son. It is not in L.'s best interest to be in an environment where he would
not be allowed to freely love and appreciate both of his parents, nor should he be placed
at risk of the long-lasting psychological impacts that can arise from such an environment.
He should primarily reside in an environment free from manipulation, sabotage, or
conditioning meant to inspire hatred. Conversely, the evidence and testimony has not
given the Court any reason to have any serious concerns that Ms. E. intends to foster
such an environment for L. which would be similarly hostile to L.'s relationship with his
father. Even in the midst of heated text messages between the parties, Ms. E. implored
Mr. E. to "think of L. first"[FN30]
and pointed out that L. "needs his mother, and father too. We both will be in his life, and
in each others unfortunately too, despite you want it or not. [sic] Maybe instead of
initiating war, try to make peace."[FN31]
Notably, no credible evidence was presented that Ms. E. failed to comply with this
Court's orders regarding Mr. E.'s parenting time during the pendency of this case.
While counsel for Mr. E. contends that his text messages after learning that Ms. E.
had left the home with their son were "justifiably angry,"[FN32]
and contends that Ms. E.'s "entire case was based upon angry text messages sent by the
father after she abandoned him and absconded with his baby,"[FN33]
the Court must be clear that the bulk of relevant evidence to support its findings either
significantly pre-date or post-date the period of shock from learning that Ms. E. had left
with their son. Ms. E. testified to the constant threats, disrespect, and humiliation she
suffered throughout their relationship and before she decided to leave with L., and the
text messages admitted as Petitioner's Exhibit 7 are from November 2023, more than
seven months after Ms. E. left and the instant custody litigation was commenced. Further,
angry text messages, regardless of the time period, are not the sole basis of this decision,
but are pieces of significant evidence which corroborate the credible testimony of Ms. E.

[*10]Decision and Order on
V-06482-23
Accordingly, for the reasons set forth above, it is hereby
ORDERED after the Court having searched the statewide registry of orders of
protection, the sex offender registry and the Family Court's warrant and child protective
records, and having notified the attorneys for the parties and for the child there are no
current results,
Mother, A.E., is awarded sole legal and physical custody of the child
L.E.
Father, K.E., is awarded parenting time as follows. He shall have alternate weekends,
father to pick up the child from daycare/school on Friday and return the child to mother's
home curbside on Sunday by 5pm. He shall also have weekly overnight visits from
Tuesday 3pm until Wednesday 7pm. However, once L. is enrolled in full time school, the
father's Tuesday evening overnight visits into Wednesday shall be contingent upon on
the father residing within 10 miles of the child's home, as to not unduly interfere with his
schooling. 
Mr. E.'s parenting time shall continue over the summer with pick up at 5:00pm
Friday and to Sunday at 5:00pm drop off, exchange location to be curbside at the home
of the mother.
The regular parenting schedule shall continue over the summer except that both
parents shall be entitled to a two-week block of parenting time over the summer with
dates to be provided on March 1 each year. In even years, father's choice shall be given
first priority and in odd years, mother's choice shall be given first priority. The
continuation of the parenting schedule will allow L. to remain enrolled in any year-round
services he may be participating in.
In odd years, father shall have Thanksgiving break from Wednesday before
Thanksgiving pickup at school/day care to Sunday at 5:00pm. In even years, mother shall
have Thanksgiving break.
In odd years, mother shall have Christmas break from the last day of school/day care
until December 26 at 5:00pm and father shall have remainder of break until the night
before school resumes at 5:00pm. In even years, father shall have Christmas break from
the last day of school/day care until December 26 at 5:00pm and mother shall have
remainder of break until the night before school resumes at 5:00pm. Exchanges curbside
at mother's home.
The parent who had Thanksgiving shall have the child for the midwinter (February)
break of the same school year, if any. The parent who had Christmas shall have the child
for the Easter/spring break of the same school year, if any.
Mother's Day shall be with Ms. E., and Father's Day shall be with Mr. E.
The parent not scheduled be with L. on his birthday per the above terms shall be
afforded an option to be with him for at least one hour if it falls on a school day, or for
four hours if it falls on a weekend. Birthday time must be requested at least 30 days
before L.'s birthday.
If either parent shall travel overnight out of the state with L. (except for NJ, CT, or
PA), they must provide the address where L. will be to the other at least 48 hours before
travel.
Both parents shall have full, independent access to the child's medical, educational
and religious records and providers. 
Neither parent shall disparage the other, nor allow any third parties to do the same in
the presence of the child. 
All communication between the parties shall be via the Our Family Wizard app
platform or any other mutually agreed upon platform for communication. 
Each parent may call/video L. once a day at 7:00pm when he is with the other parent.
L. shall be permitted to initiate other calls/video calls to the other parent at other
times.
Mother may not relocate with the child beyond a 15-mile radius of her current
residence without written consent by father or court order, unless such relocation is
closer to the father's residence.
Order on V-10782-23:
This docket is dismissed with
prejudice as custody and parenting time is awarded as described above under Docket
V-06482-23.
Dated: September 25, 2025
ENTER:
Hon.
Nisha Menon

Footnotes

Footnote 1: While on cross
examination Mr. E. denied that he visited this particular bar "often," but he also did
testify that it was the "closest bar to home" and that he would go there "once every ten
days, once every two weeks." Tr 8/19/24 at 6-7.

Footnote 2: Tr 3/15/24 at 48, lines
13-14

Footnote 3: Id. at 49, lines
1-2

Footnote 4: Id. at 48, lines
24-25

Footnote 5: Respondent's Exhibit A

Footnote 6: Tr 3/15/24 at 28, line 19

Footnote 7: Tr 8/21/24 at 26, lines
14-15

Footnote 8: Tr 9/21/24 at 33, lines
3-4

Footnote 9: Tr 9/23/24 at 70, lines
18-19 ("He would threaten to slap me if I won't stop talking, he would threaten me that
he will abuse me, yes . . . ")

Footnote 10: Tr 2/19/25 at 14,
lines 9-10

Footnote 11: Id. at 14,
lines 13-15

Footnote 12: Petitioner's Exhibit
7 at 2, 3

Footnote 13: Id.at 3

Footnote 14: Petitioner's Exhibit
7 at 5. ("Hate his mother? I don't need to teach him that, once he realizes that she is a
money worshipper and that she alienated him from his father, lied about everything, used
his father to get money and a green card, and used him to have her lifestyle financed, he
will automatically know who she is.")

Footnote 15: Respondent's
Exhibit K

Footnote 16: Petitioner Father's
Post Trial Summation at 10

Footnote 17: Tr 3/15/24 at 48,
lines 13-14

Footnote 18: Id. at 50,
line 17

Footnote 19: Petitioner's Exhibit
7 at 2 (and duplicated at 3)

Footnote 20: Id. at 3

Footnote 21: Id. at 5

Footnote 22: Id. at 7

Footnote 23: Respondent's
Exhibit L at 5

Footnote 24: Respondent's
Exhibit L at. 8

Footnote 25: Petitioner's Exhibit
7 at 5

Footnote 26: Id.

Footnote 27: Tr 12/20/24 at 4,
lines 16-21. ("It was always an argument between us. I never wanted to move to New
Jersey. He was pushing, pressuring me to move there." . . . "Under his pressure, at some
point I did agree.")

Footnote 28: Petitioner's Exhibit
7 at 5

Footnote 29: Id.

Footnote 30: Respondent's
Exhibit 7 at 7

Footnote 31: Id.

Footnote 32: Petitioner Father's
Post Trial Summation at 2

Footnote 33: Id. at 7